UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 4, 2015

------------------------------------------------------------------X
EDWARDO ROMAN,  :
  :
             Plaintiff,  :
  :
          -v-  :
  :
CAROLYN COLVIN, Acting Commissioner of  :
Social Security,  :
  :
            Defendant.  :
------------------------------------------------------------------X

13-cv-7284 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Plaintiff Edwardo Roman ("plaintiff" or "Roman") seeks review of the decision by defendant Commissioner of Social Security (the "Commissioner") finding that he was not disabled and not entitled to Social Security Disability ("SSD") benefits under Title II or Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act").

Plaintiff filed applications for SSD and SSI benefits on May 2, 2011 and May 18, 2011, respectively. (Tr. 37.) The Commissioner denied plaintiff's applications on July 6, 2011. (Tr. 74-81.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and appeared pro se before ALJ Mark Solomon on February 22, 2012. (Tr. 51-71.) On February 29, 2012, the ALJ found that plaintiff was not disabled. (Tr. 34-48.) This decision became the final decision of the Commissioner on August 15, 2013, when the Appeals Council denied plaintiff's request for review. (Tr. 1-5.)

On October 16, 2013, plaintiff filed this action seeking judicial review of the ALJ's January 17, 2014 decision.  (ECF No. 1.)  Before the Court are the parties' cross-motions for judgment on the pleadings.[1]  (ECF Nos. 19, 26.)  For the reasons set forth below, plaintiff's motion is GRANTED, defendant's motion is DENIED, and this action is remanded to the Commissioner for further proceedings.

I.      BACKGROUND

This Court reviews the ALJ's decision to determine whether there is substantial evidence to support his determination that plaintiff was not disabled between January 1, 2009, the alleged onset date, and February 29, 2012, the date of the ALJ's decision.[2]

Plaintiff was born on July 28, 1978.  (Tr. 57.)  He has an eighth-grade education and he previously worked as a dispatcher, maintenance worker, messenger, and truck driver.  (Tr. 149.)  Plaintiff alleges that he became disabled on January 1, 2009 due to morbid obesity, severe obstructive sleep apnea ("OSA") with low oxygen levels, excessive daytime sleepiness ("EDS"), tendinitis, chronic bilateral ankle sprain/strain, chronic knee pain, learning disabilities, and depression.  (See Motion for Summary Judgment ("Pl.'s Mem.") at 2, ECF No. 19.)

---

[1] While plaintiff's motion is entitled "motion for summary judgment," it is a motion for judgment on the pleadings.

[2] Title II benefits may be paid retroactively for up to 12 months prior to filing of an application.  See 20 C.F.R. § 404.621.  Payment of Title XVI benefits, however, cannot precede the month following the month of application.  See 20 C.F.R. § 416.335.

2

A.   <u>Medical Evidence Before the ALJ</u>

On April 16, 2009, plaintiff presented for his annual physical exam with Dr. Elizabeth White of Settlement Health Clinic.  (Tr. 188-190.)  Plaintiff stated that he had used angel dust (PCP) and had quit three years before.  (Tr. 189.)   Upon examination, plaintiff was obese with normal examination findings of his head, eyes, ears, neck, and heart.  (Tr. 189.)  Plaintiff's pharynx was crowded.  (<u>Id.</u>)  His breath sounded distant, but his lungs were clear.  (<u>Id.</u>)  Dr. White diagnosed obesity and risk of sleep apnea.  (Tr. 190.)  She referred plaintiff for a sleep study, and stated that she would discuss gastric bypass surgery with plaintiff after the sleep study.  (<u>Id.</u>)  A complete blood count, cholesterol test, and comprehensive metabolic panel were all normal aside from high ALT and high glucose levels.  (Tr. 191-93.)

On June 2, 2009, during a follow-up visit, Dr. White reported that plaintiff had pain in his right leg, which might improve with weight loss.  (Tr. 194-95.)  Upon physical exam, Dr. White observed that plaintiff had diminished sensation to light touch on his right upper thigh.  (Tr. 195.)  Dr. White noted that plaintiff had been exercising, changed his eating habits, and lost 20 pounds.  (Tr. 194.)  She referred him to a nutrition and bariatric clinic and prescribed ibuprofen.  (Tr. 195.)  Dr. White also noted that plaintiff had a pending appointment for sleep apnea.  (Tr. 194.)

On June 8, 2009, Dr. Steven Karasik, a podiatrist, performed a complete examination and evaluation of plaintiff.  (Tr. 196.)  Dr. Karasik diagnosed plaintiff with tendonitis, plantar fasciitis, and xerosis cutis.  (<u>Id.</u>)  X-rays of plaintiff's feet showed small calcaneal spurs.  (<u>Id.</u>)  Dr. Karasik recommended sneakers,

stretching, applying ice, and foot orthotics.  (Id.)  He also discussed foot fungus and treatments, and prescribed kerol emulsion.  (Id.)  Dr. Karasik's findings are documented in a June 10, 2009 letter to Dr. White—in which Dr. Karasik wrote, "I will keep you informed as to Edward's progress."  (Id.)

On July 8, 2009, a nutrition assessment showed that plaintiff exercised on the elliptical machine and did push-ups and sit-ups for one to two hours, three to four times per week.  (Tr. 197.)

On December 10, 2009, Dr. White examined plaintiff during a follow-up visit. (Tr. 198-200.)  Plaintiff stated that he had been using the CPAP machine for the past month and was feeling better and more energetic, but gaining weight.  (Tr. 198.)  He was considering gym membership and deferring gastric bypass surgery. (Id.)  Upon exam, Dr. White observed a small bulbous brown mass on the left calf. (Tr. 199.)  Dr. White advised plaintiff to stay motivated to lose weight and diagnosed him with obstructive sleep apnea, for which she recommended following up regarding the CPAP.  (Id.)  She also referred plaintiff to a dermatologist.  (Id.)

On April 22, 2010, plaintiff had a follow-up visit with Dr. White.  (Tr. 204-06.) Plaintiff reported that he stopped using the CPAP because it was too intense and he was sleeping better without it—and stated that he would schedule a follow-up appointment with the sleep apnea site.  (Tr. 204-05.)  Plaintiff was motivated to lose weight: he joined a gym and went four to five times per week.  (Tr. 205.)  He also reported starting a job as a maintenance man.  (Id.)  Plaintiff complained of right wrist pain with numbness to the first three fingers.  (Id.)  After an exam, Dr. White

diagnosed plaintiff with carpal tunnel syndrome in addition to obstructive sleep apnea and obesity.  (Tr. 204, 205.)  A complete blood count, cholesterol test, and comprehensive metabolic panel all showed normal results aside for a low alkaline phosphatase level.  (Tr. 201-03.)

On August 5, 2010, plaintiff presented to Dr. White for bilateral knee pain. (Tr. 207-08.)  Plaintiff reported that, about three weeks earlier, he fell asleep while standing and his knees buckled.  (Tr. 207.)  Since then, he had experienced pain at the inner part of his knees.  (Id.)  Plaintiff indicated that he was on CPAP for a while, underwent a titration of CPAP, and ended up in an emergency room due to deep sleep.  (Tr. 208.)  Plaintiff reported that he stopped taking angel dust a month prior and was sleeping much better.  (Id.)  He also reported that he was participating in a drug treatment program.  (Id.)  Upon physical examination, Dr. White observed full range of joint motion bilaterally and no swelling, joint tenderness, or crepitus in the knees.  (Id.)  Dr. White diagnosed risk of sleep apnea, obesity, substance abuse and knee pain, noting plaintiff's recent weight gain as a possible contributing factor.  (Tr. 207-08.)  Dr. White prescribed ibuprofen.  (Id.)

On October 11, 2010, x-rays of plaintiff's right knee, foot, and ankle produced completely normal results.  (Tr. 217-19.)  On November 29, 2010, x-rays of the left foot and ankle showed no evidence of acute fracture or subluxation.  (Tr. 215-16.)

On December 1, 2010, Dr. Johanna Godoy, a podiatrist at the Metropolitan Hospital Center, saw plaintiff for follow-up on a cut on plaintiff's fifth left toe.  (Tr. 228-29.)  Plaintiff had been treated in the emergency department on November 29,

2010, after stepping into a pothole. (Tr. 228.) Plaintiff presented with crutches. (Tr. 228.) Dr. Godoy diagnosed status post laceration of the plantar aspect of the fifth left toe with cellulitis complications. (Tr. 228-29.) Dr. Godoy cleaned the wound and redressed it. (Tr. 229.)

On December 8, 2010, plaintiff had a follow-up visit with Dr. Godoy. (Tr. 224-26.) Plaintiff presented without crutches, but was wearing a surgical shoe. (Tr. 224.) Plaintiff stated that his lawyer wanted him to get an MRI of the left foot as soon as possible as he was planning to file a lawsuit against the city for the pothole incident. (Id.) His dressing was not wet but there was a mild amount of drainage coming through the bandage. (Id.) The site was negative for erythema but positive for edema (without signs of infection). (Id.) Sutures were intact. (Id.) Dr. Godoy reported that plaintiff's motor function to the left fifth toe was slightly decreased because of the edema. (Id.) Dr. Godoy applied a dry, sterile dressing with betadine and ordered an MRI. (Tr. 225.)

On December 12, 2010, plaintiff visited the Harlem Hospital Center Emergency Department for a dressing change on his left toe. (Tr. 181-86.) Dr. Jose Carbajal irrigated the wound and applied sterile dressing. (Tr. 181.) Dr. Carbajal observed that plaintiff was obese but in no acute distress. (Tr. 182.) He had a steady gait. (Tr. 185.) His toe was healing, with no surrounding erythema, drainage from wound, swelling, or warmth. (Tr. 182.) Dr. Carbajal noted that plaintiff's condition was improved, and instructed him to return to Metropolitan Hospital Center as scheduled in two days for suture removal. (Tr. 181.)

On December 15, 2010, plaintiff had a follow-up visit with Dr. Susan Rice, a podiatrist at the Metropolitan Hospital Center. (Tr. 221-22.) Plaintiff presented with a surgical shoe on the left foot. (Tr. 221.) Edema and macerations of the second, third, and fourth interspaces were noted, but the toe was negative for erythema, drainage, and signs of infection. (Tr. 221.) Sutures appeared intact. (Id.) Dr. Rice re-applied a dressing with betadine and instructed plaintiff to avoid getting the dressing wet or removing it. (Tr. 222.) She recommended follow up in one week. (Id.)

On December 31, 2010, an x-ray of plaintiff's right knee showed evidence consistent with Pellegrini-Stieda disease, likely the result of a prior injury. (Tr. 214.)

On April 14, 2011, plaintiff presented to Dr. John Poff of Settlement Health for blisters on both feet. (Tr. 209-11.) Plaintiff had been trying to increase his aerobic activity to lose weight. (Tr. 210.) Upon exam, Dr. Poff observed that plaintiff was obese, but well developed and in no acute distress. (Id.) Plaintiff had cracked and broken blistered areas but with no appearance of infection. (Id.) He had a large raised lesion of dark color. (Id.) Dr. Poff stated that he suspected the blisters would heal with simple soap and water hygiene. (Id.) He said that plaintiff must use properly fitted shoes and wear them correctly, not as fashion dictates. (Id.) Dr. Poff encouraged plaintiff to continue aerobic activity and a lower carb diet, and referred him to a dermatologist for his skin lesion. (Tr. 210-11.)

On May 23, 2011, an x-ray of plaintiff's chest showed normal results with no signs of acute cardiopulmonary disease. (Tr. 213.)

As of June 2, 2011, plaintiff's chart summary at Settlement Health showed that plaintiff's subscriptions for ibuprofen and bilateral wrist splints (to wear at night for carpal tunnel syndrome) were last refilled in 2010. (Tr. 187.)

On June 20, 2011, plaintiff visited Dr. Iqbal Teli for a consultative examination in connection with his claim for benefits. (Tr. 230-32.) Plaintiff complained of experiencing sharp pain (10/10 in intensity) in his right ankle when he walks. (Tr. 230.) Plaintiff reported that he has had the pain for 10 years and that it lasts for several hours. (Id.) As to his activities of daily living, plaintiff reported that he could shower and dress daily, watch TV, and go out for walks. (Id.) He denied a history of alcohol or drug abuse. (Id.)

Upon exam, Dr. Teli observed that plaintiff was not in acute distress, had normal gait, needed no help changing for the exam or getting on and off the exam table, was able to rise from his chair without difficulty, and used no assistive devices. (Id.) He could not walk on his toes with comfort, but was able to do a full squat and had a normal stance. (Id.) Examination of plaintiff's skin, head, face, eyes, ears, nose, throat, neck, chest, lungs, heart, and abdomen showed normal results. (Tr. 231.) The exam showed full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally in the cervical and lumbar spines. (Id.) Straight leg raises were negative bilaterally. (Id.) There was no scoliosis or abnormality in the thoracic spine. (Id.) Plaintiff had full range of motion in his

shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally.  (Id.)  His joints were stable and non-tender.  (Id.)  There was no redness, heat, swelling, or effusion.  (Id.)  Plaintiff exhibited no sensory deficits; full strength in the upper and lower extremities; no cyanosis, clubbing, or edema; no significant varicosities or trophic changes; no muscle atrophy; intact hand and finger dexterity; and 5/5 grip strength bilaterally.  (Tr. 231-32.)  X-rays of plaintiff's lumbar spine and right ankle were both negative.  (Tr. 232, 233-34.)  Dr. Teli diagnosed a history of right ankle pain, but noted that plaintiff's prognosis was stable.  (Tr. 232.)

On June 30, 2011, Dr. M. Crumb, a medical consultant from the State Agency, completed a residential functional capacity assessment form.  (Tr. 269-74.) Dr. Crumb reported that plaintiff could lift and carry 20 pounds occasionally and up to 10 pounds frequently; could sit, stand, and walk for six hours in an eight-hour workday (with normal breaks); and could push and pull without limitation.  (Tr. 270.)  Dr. Crumb reported that plaintiff's height is 65 inches and his weight is 288 pounds.  (Id.)  Dr. Crumb reported that 2010 x-rays of plaintiff's right ankle revealed no evidence of fracture but that plaintiff is unable to walk on his toes without discomfort.  (Id.)  Dr. Crumb also reported that plaintiff's physical exam was basically normal and that x-rays of his LS spine and right ankle were within normal limits.  (Id.)  Dr. Crumb found that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 271-72), and concluded that plaintiff's allegations were "credible but not to the degree alleged" (Tr. 272) and that plaintiff had "a light RFC" (Tr. 273).

On August 19, 2011, Dr. Mohammed Basit, a sleep specialist, wrote a letter stating that plaintiff is suffering from severe sleep apnea with low oxygen and daytime sleepiness.  (Tr. 279.)  The doctor stated that plaintiff was not tolerating the CPAP and that he did not recommend driving or doing any tasks that required vigilance.  (Id.)  The doctor stated that plaintiff could not concentrate, work, or attend classes because of his excessive tiredness and sleepiness.  (Id.)

On the same day, Dr. White wrote a letter stating that plaintiff's diagnoses were morbid obesity and obstructive sleep apnea—and that plaintiff is unable to work.  (Tr. 280.)  Also that day, Dr. Karasik wrote a letter reporting that plaintiff had a history of chronic ankle sprain with pain relief from cortisone injections and immobilizations.  (Tr. 281.)  Dr. Karasik stated that plaintiff still complained of occasional pain and swelling.  (Id.)

On September 16, 2011, Dr. Basit repeated his August 19, 2011 letter, except he noted that plaintiff was not tolerating biPAP (rather than CPAP).  (Tr. 282.)

B.    Non-Medical Evidence Before the ALJ

In a work activity report dated May 18, 2011, plaintiff stated that he worked from February 2010 to July 2010 as a maintenance worker for 35 hours per week.  (Tr. 132; see also Tr. 58, 148-49, 251.)  In a disability report, plaintiff stated that his sleep apnea, pain in both ankles, and learning disability limited his ability to work.  (Tr. 148.)  Plaintiff stated that he stopped working on July 1, 2010 because of his conditions and because he was fired.  (Tr. 148.)  Plaintiff completed school through the eighth grade and had been in special education classes for one year.  (Tr. 149.)

He had previously worked as a dispatcher, maintenance worker, messenger, and truck driver.  (Id.)

In a disability report dated August 3, 2011, plaintiff indicated that he had difficulty sleeping and was constantly tired.  (Tr. 156.)  In an Activities of Daily Living Report dated June 24, 2011, plaintiff described his daily activities as follows: "wash and brush my teeth, prepair [sic] breakfast and do my errans [sic].  Or appt. Watch T.V. eat then go to bed."  (Tr. 240.)  Plaintiff stated that he took care of a dog. (Id.)  Plaintiff reported falling asleep while cooking, using the toilet, and bathing. (Tr. 240-41.)  He indicated that he prepares his own food daily "if someone watches [him]."  (Tr. 241.)  Plaintiff stated that he had no problems caring for his hair, shaving, feeding himself, or doing laundry.  (Tr. 240-42.)  Plaintiff stated that he went outside every day, traveling on foot and using public transportation.  (Tr. 242.) He could go outside alone.  (Id.)  Plaintiff reported shopping for food and being able to pay bills, count change, and handle a savings account.  (Tr. 243.)  He indicated that he plays video games and watches television every day.  (Id.)  Plaintiff stated that he spends time with others but does not socialize outside of the home and gets depressed.  (Tr. 244.)  He reported problems lifting, standing, kneeling, squatting, and reaching, but no problems walking (for "not too long"), sitting, using his hands, seeing, hearing, talking, paying attention, finishing what he started, following spoken and written instructions, getting along with authority figures, or remembering things.  (Tr. 244-47.)  Plaintiff reported that stress or schedule changes do not affect him.  (Tr. 247.)

11

At the hearing before ALJ Solomon on February 22, 2012, plaintiff explained that he was nearly two hours late to the hearing because he woke up late due to his sleep disorder and had difficulty walking over to the hearing office because of his ankle brace.  (Tr. 57-58.)  He testified that he stopped working in 2010 because he was laid off and accused of something he did not do.  (Tr. 58-59.)  Plaintiff testified that if he had not been laid off, he would have tried to continue to work.  (Tr. 60.) He stated that he is receiving treatment for a sleeping disorder and pain in both ankles.  (Id.)  Plaintiff testified that he had been using the CPAP machine for about two years.  (Tr. 61-62.)  While he still alleged some problems sleeping, plaintiff attested that CPAP therapy helped him "a little"—and that he slept for five to six hours with the CPAP machine on.  (Tr. 62.)  Plaintiff further testified that he has a cane, but does not use it all the time and forgot to bring it to the hearing because he was rushing.  (Tr. 62-63.)  Later, plaintiff testified that he used his cane all the time except when he forgot it.  (Tr. 67.)  He also testified that he used an ankle brace to help with his walking.  (Id.)  Plaintiff testified that he used public transportation by himself and could take care of his personal needs, including dressing, bathing, and feeding himself.  (Tr. 62, 63.)  He testified that he had no problems using his hands. (Tr. 64.)  Plaintiff claimed that he did not drive and that if he sat for five to ten minutes without doing anything or someone keeping him up, he would fall asleep. (Tr. 64-65, 69.)  He could stay awake for about half an hour if he kept busy, but then would start to fall asleep.  (Tr. 65.)

12

Plaintiff testified that he had been taking GED class for about six months, four days a week, four hours a day.  (Tr. 65-66.)  He explained that he was able to stay awake in class because the teacher worked with him and knew his disorder. (Tr. 66.)  Plaintiff testified that he helped around the house and did chores after class.  (Id.)  He testified that he exercised at a gym at least three times a week for about one hour each time—using a machine that stretched his legs and a special machine to walk on because he could not use a treadmill due to his weight.  (Tr. 67-68.)  Plaintiff testified that he stopped using angel dust about a year earlier, and was not currently using any drugs.  (Tr. 69.)

C.     Additional Evidence Before the Appeals Council

Plaintiff submitted additional evidence to the Appeals Council in connection with his request for review of the ALJ's February 29, 2012 decision.  This evidence included additional medical evidence from plaintiff's visits with Dr. Basit during the relevant time period (which the ALJ incorporated into the record), as well as medical evidence post-dating the ALJ's decision (which the ALJ did not incorporate into the record).  (Tr. 1-5.)  The ALJ determined that the new evidence in the record did not provide a basis for changing the ALJ's decision—and that the evidence post-dating the ALJ's decision was "about a later time" and therefore also did not affect the ALJ's decision.  (Tr. 2.)

1.     Evidence that the Appeals Council Made Part of the Record

On September 3, 2009, Dr. Basit examined plaintiff for EDS.  (Tr. 291.)  Dr. Basit reported that plaintiff experienced mild EDS (which had been worse but improved after a 50-pound weight loss), loud snoring, gasping for air, and witnessed

apnea.  (Id.)  These symptoms had been present for two years.  Plaintiff had no

excessive tiredness.  (Id.)  He had been talking in his sleep, but denied night terrors,

nightmares, cataplexy, hypnogogic hallucinations, and sleep-walking.  (Id.)

Plaintiff did not have morning headaches and did not awaken with dry mouth.  (Id.)

His sleep was restorative.  (Id.)  He went to bed around 11 p.m. and fell asleep

within 30 minutes while watching television.  (Id.)  He woke up at 6 a.m., went back

to sleep at 7 a.m., and woke up again at 9 to 10 a.m.  (Id.)  Plaintiff denied having,

inter alia, orthopnea, depression, anxiety, headaches, dizziness, or vertigo.  (Id.)  He

denied using alcohol—but stated that he was a smoker.  (Tr. 292.)  A mental health

examination showed no abnormal behavior.  (Id.)  Upon physical examination, Dr.

Basit observed obesity, a short neck, narrow posterior airway space ("PAS") in the

throat, normal heart and breath sounds, a normal abdomen, and an absence of

edema.  (Id.)  Dr. Basit recommended a polysomnograph and weight loss.  (Tr. 293.)

On October 25, 2009, Dr. Basit conducted an overnight polysomnograph and

diagnosed plaintiff with severe sleep apnea/hypopnea.  (Tr. 283.)  Dr. Basit reported

successful titration of sleep apnea/hypopnea with continuous positive airway

pressure ("CPAP") therapy.  (Id.; see also Tr. 284-290, 294-295.)  Dr. Basit

recommended weight loss and a treatment trial with CPAP at a pressure of 16.0

cm/H2O during sleep.  (Tr. 283.)  Dr. Basit also cautioned plaintiff about driving

and operating dangerous machinery if he had daytime symptomatology.  (Id.)

Dr. Basit's notes, dated October 26, 2009, state that Dr. Basit spoke with

plaintiff about his severe obstructive sleep apnea, that plaintiff wished him to order

CPAP, and that he would order PAP.  (Tr. 295.)  Dr. Basit's notes also state that plaintiff would visit him the following Wednesday (which would be October 28, 2009).  (Id.)

On May 20, 2010, plaintiff had a follow-up visit with Dr. Basit.  (Tr. 296-98.) Plaintiff stated that he used the CPAP sometimes, but felt that the pressure was too high.  (Tr. 296.)  Plaintiff reported no alcohol use.  (Id.)  A mental examination revealed no abnormal behavior.  (Tr. 297.)  Upon physical examination, Dr. Basit observed that plaintiff was obese and his PAS was narrow in the throat, but his nose showed no sinus tenderness and normal nasal skin.  (Id.)  Dr. Basit discussed EDS precautions, informed plaintiff of the risks of untreated obstructive sleep apnea, and recommended weight loss.  (Id.)  Dr. Basit diagnosed severe obstructive sleep apnea and prescribed biphasic positive airway pressure ("biPAP") titration. (Tr. 297-98.)

On June 6, 2010, plaintiff underwent a titration study.  (Tr. 299.)  At 10 p.m., plaintiff fell asleep.  (Id.)  At 10:30 p.m., plaintiff started experiencing sleep apnea symptoms and was started on CPAP 7.0 cm/H2O.  (Id.)  At 11 p.m., the CPAP was increased to 19 cm/H2O due to snoring, complete nasal obstruction, severe sleep apnea symptoms, and desaturation.  (Id.)  At 1:00 a.m., the top biPAP pressure was reached due to severe nasal obstruction—and then subsequently reduced to try to improve the flow and critical saturation.  (Id.)  At approximately 1:30 a.m., the technician called Dr. Basit and emergency medical services ("EMS") because he was

15

unable to wake plaintiff.  (Tr. 299-300.)  The EMS technician was able to wake plaintiff, and plaintiff went to the hospital.  (Tr. 300.)

On July 29, 2011, plaintiff reported to Dr. Basit that he had been using the CPAP machine for half the night, his EDS was getting better, and he had lost 16 pounds.  (Tr. 301.)  Plaintiff's mental status, cardiovascular system, and respiratory system were normal.  (Tr. 302.)

On August 19, 2011, Dr. Basit noted that plaintiff had no new complaints but still had EDS.  (Tr. 304.)  Plaintiff's mental status was normal and his nose had no sinus tenderness and normal nasal skin.  (Tr. 303.)  Dr. Basit stated that he would do a retitration study.  (Id.)

On September 4, 2011, plaintiff visited Dr. Basit for a titration test, which included a trial of biPAP.  (Tr. 305-06.)  On September 16, 2011,[3] during a follow-up visit, Dr. Basit diagnosed plaintiff with severe obstructive sleep apnea.  (Tr. 308.) (Tr. 305-307.)  He discussed with plaintiff the side effects of using CPAP, as well as weight loss and risks of untreated obstructive sleep apnea.  (Tr. 308.)

On November 18, 2011, during a follow-up visit with Dr. Basit, plaintiff reported no new complaints.  (Tr. 310.)  He reported using biPAP every night and feeling much better.  (Id.)  He had no difficulty using the machine, did not awaken at night, his sleep was restorative, and he felt tired only if he did not use the biPAP.

---

[3] Dr. Basit's report is dated September 16, 2011, but the signature date is September 19, 2011.  (See Tr. 307, 309.)

(Id.)  Dr. Basit again observed that plaintiff was obese, but plaintiff's mental status, cardiovascular system, and respiratory system were normal.  (Tr. 311.)

        2.    <u>Evidence that the Appeals Council Did Not Make Part of the Record</u>

On March 19, 2012, plaintiff reported to Dr. Basit that he was using the CPAP machine for five hours and felt "OK," but the machine was no longer working and now he had EDS and EDT.  (Tr. 28.)  Plaintiff's mental status, nose, cardiovascular system, and respiratory system were normal.  (Tr. 29.)  Dr. Basit assessed Plaintiff as clinically stable, and took steps to repair the CPAP machine or otherwise replace it.  (Id.)  On the same day, Dr. Basit wrote a letter stating that plaintiff continued to suffer from daytime sleepiness and severe sleep apnea with low oxygen for which he was currently on CPAP therapy.  (Tr. 31.)

On March 20, 2012, Dr. White wrote a letter stating that plaintiff's diagnoses included obstructive sleep apnea, morbid obesity, and depression, and plaintiff could not work.  (Tr. 33.)  In a medical report form dated May 10, 2012, Dr. White added a diagnosis of bilateral ankle pain.  (Tr. 20.)  The clinical findings provided by Dr. White were plaintiff's weight (276 pounds) and that he had undergone a sleep study and used a CPAP machine at bedtime.  (Id.)  The prognosis was "fair."  (Tr. 21.)  Dr. White reported that plaintiff falls asleep easily; could stand for 20 to 30 minutes continuously and for a total of 2 to 3 hours in an 8-hour workday; and could walk up to 20 minutes continuously and for a total of 2 hours in an 8-hour workday. (Tr. 22.)  He could lift and carry up to five pounds continuously and 6 to 10 pounds occasionally, and could never lift or carry more than 10 pounds.  (Id.)  He could bend

and reach occasionally, but could never squat or climb.  (Tr. 22-23.)  Dr. White

reported that plaintiff could use his hands (but not his legs and feet) for repetitive

action such as simple grasping, pushing and pulling, and fine manipulation.  (Tr.

23.)  Dr. White reported that plaintiff could not drive a motor vehicle; was mildly

restricted in dealing with unprotected heights and being around moving machinery;

was moderately restricted in dealing with stress; and had no restrictions in

exposure to mark changes in temperature and humidity, as well as dust, fumes, and

gases.  (Tr. 23-24.)  Plaintiff's concentration was poor due to his depression.  (Tr.

24.)  Dr. White opined that work on a regular and continuous basis would cause

plaintiff's condition to deteriorate.  (Id.)  Dr. White further stated that plaintiff is

physically able to travel to and from work daily by bus but not by subway, with

stairs posing a problem.  (Id.)  Dr. White opined that plaintiff could not engage in

any work on a sustained, full-time basis due to poor concentration and depression.

(Tr. 25.)

On March 26, 2012, Dr. Brian Levy, a podiatrist, wrote that his office was

treating plaintiff for tendonitis and that plaintiff had received cortisone injections

and an ankle brace.  (Tr. 32.)

On May 11, 2012, Dr. Basit completed a medical report.  (Tr. 15-19.)  The

report states that plaintiff visited Dr. Basit every four months between September

3, 2009 and March 19, 2012.  (Tr. 15.)  Dr. Basit reported that plaintiff had severe

obstructive sleep apnea which would resolve only if he lost weight.  (Id.)  The

clinical findings were obesity and narrow PAS.  (Id.)  When asked about plaintiff's

need to lie down during the day, Dr. Basit stated that plaintiff should take a nap when feeling sleepy.  (Tr. 16.)  The prognosis was "fair."  (Id.)  Dr. Basit reported that plaintiff was moderately restricted in his ability to drive a motor vehicle if he was sleepy, and totally restricted in dealing with to unprotected heights and being around moving machinery.  (Tr. 18.)  He could travel to and from work via bus and subway.  (Tr. 19.)  Dr. Basit declined to assess plaintiff's remaining restrictions, if any, noting that this section needed to be completed by plaintiff's primary care physician.  (Tr. 17-18.)  Dr. Basit opined that work on a regular and continuous basis would not cause plaintiff's condition to deteriorate.  (Tr. 19.)  Dr. Basit commented that plaintiff's condition can cause EDS/EDT, that he would need to nap during the day, and that he might sometimes have less concentration.  (Id.)

On May 23, 2012, Dr. Karasik completed the same medical report.  (Tr. 9-14.) The report states that Dr. Karasik had been treating plaintiff in 3-5 month intervals between June 8, 2009 and March 26, 2012.  (Tr. 9.)  Dr. Karasik's prognosis as set forth in the May 23, 2012 report was "fair/good."  (Tr. 10.)  Dr. Karasik reported that, as a result of plaintiff's tendonitis and chronic ankle sprain/strain, he could not sit for long (due to swelling); could stand for a total of 15 to 20 minutes in an 8-hour workday; and could walk up to 20 minutes continuously and for a total of one hour in an 8-hour workday.  (Tr. 9, 11.)  He could lift and carry up to five pounds frequently and 6 to 10 pounds occasionally, and could never lift or carry more than 10 pounds.  (Tr. 11.)  Plaintiff could bend and reach occasionally, but could not squat or climb.  (Tr. 11-12.)  Plaintiff could use his hands for repetitive

19

actions, but painful ankles precluded using his legs and feet for repetitive movements.  (Tr. 12.)  Dr. Karasik assessed no restrictions in dealing with stress, exposure to mark changes in temperature and humidity or to dust, fumes, and gases; mild restrictions with unprotected heights and being around moving machinery;[4] and a moderate restriction with driving.  (Tr. 12-13.)  Dr. Karasik opined that work on a regular and continuous basis would not cause plaintiff's condition to deteriorate but that plaintiff could not engage in any work on a sustained, full-time basis because of pain in his ankles.  (Tr. 13, 14.)  Dr. Karasik reported that plaintiff could travel to and from work by bus and subway.  (Tr. 13.)[5]

D.     The ALJ's Decision

The ALJ applied the five-step framework required by 20 C.F.R. §§ 404.1520 and 416.920.

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2009, the alleged onset date, though he earned $3,165.00 in 2010 and stopped working for reasons unrelated to his physical ailments.  (Tr. 39.)  Plaintiff does not challenge this determination.

At steps two and three, the ALJ found that plaintiff had four severe impairments—sleep apnea, obesity, bilateral calcaneal spurs, and right knee

---

[4] Dr. Karasik marked both "mild" and "total" columns for these two medical conditions.  (Tr. 12.)

[5] Plaintiff's brief also attaches and refers to recently completed (May 2014) medical reports by Drs. White, Basit, and Karasik similar to those submitted to the Appeals Council.  (See Pl.'s Mem. at 2-3.) This evidence—which was not presented to the ALJ or the Appeals Council—is not probative to the determination of disability as it as it post-dates the ALJ's decision by more than two years, and the authors did not relate their findings back to the relevant period.  Accordingly, the Court does not consider this evidence.  See Lisa v. Sec'y of Health and Human Servs., 940 F.2d 40, 43 (2d Cir. 1991) (citing Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)).

Pellegrini-Stieda disease—but no impairment or combination of impairments that met or medically equaled the severity of any impairment listed in Appendix 1. (Tr. 39-41.)  The ALJ found that plaintiff's carpal tunnel syndrome, toe injury, blisters in both feet, and history of drug dependence were not severe impairments. (Tr. 40.)  In addition, the ALJ found that plaintiff "had no medically determinable impairment associated to his learning difficulties" because, while the record shows that plaintiff only completed the eighth grade, there is no evidence of any learning impairment since the alleged onset date. (Id.)

The ALJ then determined plaintiff's RFC. (Tr. 41-46.)  The ALJ found that plaintiff could perform "less than the full range of sedentary work," and could lift and carry 10 pounds occasionally and less than 10 pounds frequently; could sit for six hours in an eight-hour work period with normal breaks and occasional walking around; could stand and/or walk for two hours in an eight-hour workday; and must avoid working at unprotected heights, driving, or working with hazardous machinery. (Tr. 41.)  The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were "not credible" to the extent they were inconsistent with this RFC assessment. (Tr. 42.)

The ALJ found that plaintiff's allegations of disabling sleep apnea were not credible on the basis of the following: (1) the statement in Dr. White's December 10, 2009 report that plaintiff had been using CPAP and was feeling better and more energetic (Tr. 198)—from which the ALJ concluded that plaintiff "received appropriate treatment for his sleep apnea and that he had an adequate response to

said treatment"; (2) the statement in Dr. White's April 22, 2010 report that plaintiff had stopped using the CPAP and was sleeping better without it (Tr. 204-05)—from which the ALJ concluded that plaintiff's "alleged[] symptoms of tiredness and sleepiness may not have been as serious as has been alleged in connection with the applications of benefits and appeals"; (3) the statement in Dr. White's August 5, 2010 report that plaintiff was "sleeping much better" (Tr. 208); (4) plaintiff's lack of complaints about his sleep apnea since August 5, 2010; (5) plaintiff's lack of treatment for sleep apnea between August 5, 2010 and September 16, 2011; and (6) the inconsistency of plaintiff's allegations that he falls asleep while sitting, bathing, and cooking but still goes to gym, takes GED classes, and remains capable of traveling alone. (Tr. 42-43.) The ALJ discounted Dr. Basit's September 16, 2011 opinion that plaintiff suffers from daytime sleepiness and severe sleep apnea because "the opinion was not accompanied by his progress notes" and because of plaintiff's "significant gap" in treatment history. (Tr. 43.) The ALJ determined that, as a result of his non-disabling sleep apnea, plaintiff must avoid working at unprotected heights, driving, or working with hazardous machinery. (Tr. 43.)

The ALJ also found that plaintiff's ankle pain, bilateral calcaneal spurs, and right knee Pellegrini-Stieda disease were not disabling conditions. (Tr. 43-44.) As to plaintiff's foot and ankle conditions, the ALJ emphasized the lack of "frequent visits to the treating podiatrist." (Tr. 43.) In that regard, the ALJ noted that the evidence from Dr. Karasik was limited to one progress note dated June 10, 2009 (Tr. 196) and one letter dated August 19, 2011 stating that plaintiff had a history of

chronic ankle sprain (Tr. 281).  (Id.)  As to plaintiff's right knee Pellegrini-Stieda disease, the ALJ found that the condition was not disabling because it was treated with ibuprofen.  (Tr. 43.)  The ALJ also relied on Dr. Teli's June 20, 2011 consultative examination (Tr. 230-32)—and noted that plaintiff's ability to go to the gym and travel alone "was inconsistent with a finding of disabling limitations."  (Tr. 44.)

As to plaintiff's obesity, the ALJ noted that plaintiff fell in the "extreme obesity" category but "has changed his eating habits and has been exercising."  (Tr. 44.)

The ALJ determined that plaintiff's "combined obesity, bilateral calcaneal spurs, and left knee Pellegrini-Stieda" limited his capacity to stand and walk to two hours in an eight-hour workday—and his capacity to sit to six hours in an eight-hour workday.  (Tr. 45.)  The ALJ noted that plaintiff's work activity after the alleged onset date undermined his allegations of disability.  (Id.)

The ALJ concluded his RFC assessment by explaining the weight he assigned to the medical opinions in the record.  (Tr. 45-46.)  The ALJ assigned little to no weight to every medical opinion in the record.

The ALJ assigned "little weight" to Dr. Basit's August 19, 2011 opinion that plaintiff had severe sleep apnea, was not tolerating CPAP, could not concentrate, and was unable to work or attend classes (Tr. 279).  (Tr. 45.)  The ALJ found that this opinion was unaccompanied by positive clinical findings—and was undermined

by the fact that plaintiff had stopped using CPAP, reported improvement of his symptoms, and indicated that he has been taking GED classes.  (Tr. 45-46.)

The ALJ assigned "no weight" to Dr. White's August 19, 2011 opinion that plaintiff suffers from morbid obesity and obstructive sleep apnea and is unable to work (Tr. 280)—because this opinion is on an issue reserved to the Commissioner. (Tr. 46.)

The ALJ discounted Dr. Karasik's August 19, 2011 opinion that plaintiff suffers from chronic ankle sprain (Tr. 281) because that opinion was unaccompanied by "[p]ositive clinical findings and progress notes."  (Tr. 46.)

The ALJ gave "little weight" to Dr. Crumb's June 30, 2011 RFC assessment form (Tr. 269-74)—in which Dr. Crumb indicated that plaintiff retained the capacity to perform light jobs—because the form was unaccompanied "by any substantive explanation of the basis for the opinion."  (Tr. 46.)

The ALJ assigned "[n]o significant weight" to Dr. Teli's finding of no physical restriction during his evaluation (Tr. 230-32) because Dr. Teli did not consider the impact of plaintiff's obesity in his functional capacities.  (Tr. 46.)

At steps four and five, the ALJ found that plaintiff was unable to perform his past relevant work, but—based on the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2—plaintiff was able to perform jobs existing in significant numbers in the national economy.  (Tr. 46-47.)  The ALJ concluded that plaintiff was not disabled, through the date of the decision.  (Tr. 47.)

II.    APPLICABLE LEGAL PRINCIPLES

    A.    <u>Judgment on the Pleadings</u>

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings."  <u>Bank of N.Y. v. First Millennium, Inc.</u>, 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).  Therefore, "[t]o survive a Rule 12(c) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  <u>Id.</u> (quoting <u>Hayden v. Paterson</u>, 594 F.3d 150, 160 (2d Cir. 2010)).

    B.    <u>The Disability Standard</u>

The Commissioner will find a claimant disabled under the Act if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  <u>Id.</u> § 423(d)(2)(A).  The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  <u>Id.</u> § 423(d)(3).

The Commissioner uses a five-step process when making disability determinations.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 ["Appendix 1"].  If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ["RFC"] to perform her past work.  Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citation and footnote omitted); see also Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998).  The claimant bears the burden of proof in steps one through four, while the Commissioner bears the burden in the final step. Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012).

C.    Review of the ALJ's Judgment

The Commissioner and ALJ's decisions are subject to limited judicial review. The Court may only consider whether the ALJ applied the correct legal standard and whether his or her findings of fact are supported by substantial evidence. When these two conditions are met, the Commissioner's decision is final.  See

Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) ("We set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." (citation omitted)); 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).  If the Commissioner and ALJ's findings as to any fact are supported by substantial evidence, then those findings are conclusive.  42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).  When the Appeals Council denies review after considering new evidence, the court reviews the entire administrative record— which includes the new evidence—and determines whether there is substantial evidence to support the decision.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)

While the Court must consider the record as a whole in making this determination, it is not for this Court to decide de novo whether the plaintiff is disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997); Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner.").  The Court must uphold the Commissioner's decision upon a

finding of substantial evidence, even when contrary evidence exists.  See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." (citation omitted)); see also DeChirico, 134 F.3d at 1182-83 (affirming an ALJ decision where substantial evidence supported both sides).

D.    The Treating Physician Rule

"[T]he treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," although an ALJ need not afford controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted).  An ALJ who does not accord controlling weight to the medical opinion of a treating physician must consider various factors, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; [and] (iv) whether the opinion is from a specialist." Id. (citing 20 C.F.R. § 404.1527(d)(2)).  After considering these factors, the ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Id. at 33.

Although the ALJ will consider a treating source's opinion as to whether a claimant is disabled or able to work, the final responsibility for deciding those issues is reserved to the Commissioner, and the treating source's opinion on them is

not given "any special significance."  20 C.F.R. § 404.1527(d)(e); see also SSR 96-5p,

1996 WL 374183, at *3 (July 2, 1996); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.

1999).  When a finding is reserved to the Commissioner, "the Social Security

Administration considers the data that physicians provide but draws its own

conclusions as to whether those data indicate disability.  A treating physician's

statement that the claimant is disabled cannot itself be determinative."  Snell, 177

F.3d at 133.  It is the ALJ's duty, as the trier of fact, to resolve conflicting medical

evidence.  See Richardson, 402 U.S. at 399.

      E.    The ALJ's Duty to Develop the Record

     Although "[t]he claimant has the general burden of proving that he or she has

a disability within the meaning of the Act," "the ALJ generally has an affirmative

obligation to develop the administrative record."  Burgess, 537 F.3d at 128 (citations

and internal quotation marks omitted).  SSA regulations require an ALJ to "inquire

fully into the matters at issue and . . . receive in evidence the testimony of witnesses

and any documents which are relevant and material to such matters."  Id. (quoting

20 C.F.R. § 702.338).  "In light of the ALJ's affirmative duty to develop the

administrative record, 'an ALJ cannot reject a treating physician's diagnosis

without first attempting to fill any clear gaps in the administrative record.'"  Id. at

129 (citation omitted); Calzada v. Astrue, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010)

("If the ALJ is not able to fully credit a treating physician's opinion because the

medical records from the physician are incomplete or do not contain detailed

support for the opinions expressed, the ALJ is obligated to request such missing information from the physician." (citing <u>Perez</u>, 77 F.3d at 47)).

When, as here, the claimant proceeds <u>pro se</u>, the ALJ's duty to develop the record is heightened.  <u>Moran v. Astrue</u>, 569 F.3d 108, 113 (2d Cir. 2009) (quoting <u>Cruz v. Sullivan</u>, 912 F.2d 8, 11 (2d Cir. 1990)) (internal quotation marks omitted); <u>see also</u> <u>Cruz</u>, 912 F.2d at 11 ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" (citation and internal quotation marks omitted)).  "The ALJ must take all reasonable steps to obtain past and current medical evidence and assessments from treating sources identified by a <u>pro se</u> plaintiff, in order to complete the administrative record."  <u>Jones v. Apfel</u>, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999) (citation omitted).  "'Reasonable efforts' in this context entails more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, as authorized by 42 U.S.C. § 405(d), and advising the plaintiff of the importance of the evidence."  <u>Id.</u> (citation omitted).  The ALJ must "enter these attempts at evidentiary development into the record."  <u>Id.</u> (citation omitted).

## III.   DISCUSSION

The ALJ failed to develop the record in this case and improperly dismissed or discounted the opinions of plaintiff's treating physicians in violation of the treating physician rule.[6]

---

[6] In light of the Court's determination that the ALJ has not carried out his duty to develop the record and has violated the treating physician rule, the Court does not consider plaintiff's other challenges

**Dr. Basit**.  On August 19, 2011, Dr. Basit opined that plaintiff suffers from daytime sleepiness and has severe sleep apnea with low oxygen.  (Tr. 279.)  Dr. Basit stated that plaintiff was not tolerating the CPAP—and that plaintiff could not concentrate, work, or attend classes because of his excessive tiredness and sleepiness.  (Id.)  Dr. Basit stated that he did not recommend that plaintiff do any tasks that required vigilance.  (Id.)  On September 16, 2011, Dr. Basit reiterated his opinions and determinations—and further stated that plaintiff was not tolerating biPAP.  (Tr. 282.)

The ALJ heavily discounted Dr. Basit's opinions in part because they were unaccompanied by clinical findings and progress notes—and in part because of what the ALJ found to be a "significant gap" in plaintiff's sleep apnea treatment history. (See Tr. 43, 46.)  However, the ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Burgess, 537 F.3d at 129 (citation and internal quotation marks omitted).  Here, the record does not reflect any effort on the part of the ALJ to obtain any additional medical records from Dr. Basit in order to confirm that progress notes did not in fact exist and that plaintiff's treatment gap was in fact real and significant.  Dr. Basit treated plaintiff on a regular basis over the course of several years, but the evidence before the ALJ was limited to two short letters that Dr. Basit wrote in August and September 2011.  The ALJ failed to obtain the extensive records that were later

---

to the ALJ's decision.  On remand, the ALJ may revisit other aspects of his decision on a full record as appropriate.

31

submitted to the Appeals Council—and likely failed to obtain many other records, including those during the purported treatment gap.[7]  Not surprisingly, the ALJ improperly failed to consider several required factors—including the frequency of examination, the length, nature and extent of the treatment relationship, evidence corroborating Dr. Basit's opinions, and whether Dr. Basit is a specialist—before deciding to give "little weight" to Dr. Basit's opinions.  Halloran, 362 F.3d at 32.

**Dr. White.**  The ALJ improperly gave "no weight" to Dr. White's August 19, 2011 opinion that plaintiff suffers from morbid obesity and obstructive sleep apnea and is unable to work (Tr. 280).  (Tr. 46.)  The ALJ summarily dismissed this opinion as made "on an issue reserved to the Commissioner" (id.), but this was erroneous for two reasons:  First, only Dr. White's opinion as to plaintiff's ability to work was on an issue reserved to the Commissioner; Dr. White's statement that plaintiff suffers from morbid obesity and obstructive sleep apnea was not.  Second, the ALJ was required to consider the data that Dr. White provided and then to draw his "own conclusions as to whether those data indicate disability."  Snell, 177 F.3d at 133.  The ALJ did not do so.

Instead, the ALJ improperly cherry-picked excerpts from Dr. White's reports while ignoring and failing to investigate the rest of the factual information in the reports.  For example, the ALJ focused on the statement in Dr. White's April 22, 2010 report that plaintiff had stopped using CPAP and was sleeping better without

---

[7] There is evidence that additional records that were not before the ALJ exist.  In particular, Dr. Basit's October 26, 2009 notes state that plaintiff would visit him the following Wednesday (which would be October 28, 2009), but there are no records from that visit.  (Tr. 295.)

it (Tr. 204-05)—from which the ALJ concluded that plaintiff's "alleged[] symptoms of tiredness and sleepiness may not have been as serious as has been alleged in connection with the applications of benefits and appeals." (Tr. 42.) However, the report states that plaintiff stopped using CPAP because it was "too intense"—and that plaintiff would schedule a follow-up appointment with the sleep apnea site. (Tr. 204-05.) Plaintiff reiterated this complaint to Dr. Basit on May 10, 2010, stating that he sometimes used the CPAP but often felt that the pressure was "too high." (Tr. 296.) The ALJ did not consider this information in his decision—and, based on the record before the Court, did not make any effort to obtain any records of plaintiff's follow-up appointment with the sleep apnea site.[8] Similarly, the ALJ seized on the statement in Dr. White's August 5, 2010 report that plaintiff was "sleeping much better" (after quitting PCP—a qualification the ALJ did not mention) (Tr. 208)—but failed to investigate the statement in Dr. White's report that plaintiff underwent a titration of CPAP and ended up in an emergency room due to deep sleep (Tr. 208). The records underlying the titration study and the emergency room incident were not before the ALJ—and were only made part of the record by the Appeals Council.

---

[8] The ALJ also improperly penalized plaintiff for "non-compliance" with the CPAP treatment without first considering alternative explanations for such non-compliance. "[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7P, 1996 WL 374186, at *7. Here, plaintiff's complaints that the CPAP was "too intense" and the pressure was "too high"— coupled with the June 6, 2010 titration study during which the technician was unable to wake plaintiff (Tr. 299)—provide an alternative explanation for plaintiff's "non-compliance."

**Dr. Karasik**.  The ALJ discounted Dr. Karasik's August 19, 2011 opinion that plaintiff suffers from chronic ankle sprain (Tr. 281) because that opinion was unaccompanied by "[p]ositive clinical findings and progress notes."  (Tr. 46.) However, as with the other doctors, the record does not reflect any effort by the ALJ to obtain further medical records from Dr. Karasik.  There is a clear gap in the record as to plaintiff's treatment with Dr. Karasik: the record contains only a June 10, 2009 letter to Dr. White setting forth Dr. Karasik's diagnoses of tendonitis, plantar fasciitis, and xerosis cutis—and promising to keep Dr. White informed as to plaintiff's progress (Tr. 196)—and a letter dated August 19, 2011 (over two years later) reporting that plaintiff has a history of chronic ankle sprain (Tr. 281).  There is evidence that more records exist: Dr. Karasik's May 23, 2012 report states that Dr. Karasik had been treating plaintiff in 3- to 5-month intervals between June 8, 2009 and March 26, 2012.  (Tr. 9.)  The ALJ was not entitled to rely on a gap in the evidentiary record to justify discounting Dr. Karasik's findings without first attempting to fill the gap.  See Burgess, 537 F.3d at 129 ("In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" (citation omitted)).

In sum, the ALJ did not "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts"—as he was required to do with a pro se claimant.  Cruz, 912 F.2d at 11.  Instead, the ALJ hastily rejected the opinions and diagnoses of plaintiff's treating physicians based on what he perceived to be gaps in

the record—without attempting to fill those gaps by obtaining the missing records or otherwise obtaining further information from plaintiff's doctors.  This was improper.  See Jones, 66 F. Supp. 2d at 524 ("The ALJ must take all reasonable steps to obtain past and current medical evidence and assessments from treating sources identified by a pro se plaintiff, in order to complete the administrative record.").

IV.    CONCLUSION

Accordingly, plaintiff's motion is GRANTED, defendant's motion is DENIED, and this case is remanded to the Commissioner for further proceedings.  On remand, the ALJ shall further develop the administrative record, reconsider his assessment of the evidence in the record, and issue a new decision consistent with this Opinion & Order.  The ALJ may reconsider any other aspect of his decision as appropriate on a complete record.

The Clerk of Court is directed to terminate the motions at ECF Nos. 19 and 26, to terminate this action, and to remand this action to the Commissioner for further proceedings consistent with this Opinion & Order.

SO ORDERED.

Dated:      New York, New York
            August 4, 2015

_____
      KATHERINE B. FORREST
      United States District Judge